**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Jermaine BROWN, Defendant–Appellant.**

No. 92–6233.

United States Court of Appeals,
Tenth Circuit.

June 4, 1993.

·Jerome Kearney, Asst. Federal Public Defender, Oklahoma, City, OK (June E. Tyhurst, Asst. Federal Public Defender, Oklahoma City, OK, on the brief), for defendant-appellant.

Mike Ringer, Asst. U.S. Atty., Oklahoma City, OK (Joe Heaton, U.S. Atty., and M. Jay Farber, Asst. U.S. Atty., Oklahoma City, OK, on the brief), for plaintiff-appellee.

Before LOGAN, HOLLOWAY and MOORE, Circuit Judges.

HOLLOWAY, Circuit Judge.

Defendant Jermaine Brown appeals his conviction and sentence for (1) conspiracy to possess cocaine with intent to distribute and to distribute the same in violation of 21 U.S.C. § 846; (2) possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1); (3) use or carrying of a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1); and (4) controlling premises and making them available for storing and distributing cocaine base in violation of 21 U.S.C. § 856(a)(2).

Brown contends the district judge misapplied the Sentencing Guidelines by granting the government's request for a two-level enhancement in offense level pursuant to U.S.S.G. § 3B1.1, based on Brown's alleged role in the offense as a "manager" of the conspiracy charged, and by refusing Brown's request for a two-level reduction in offense level pursuant to U.S.S.G. § 3B1.2 for his alleged "minor participant" role. Brown also contends the court erred in denying his motion for a judgment of acquittal, claiming the evidence was insufficient to support his convictions.

I

Viewing the evidence in the light most favorable to the government as we must following a guilty verdict, *United States v. Dysart*, 705 F.2d 1247, 1248 (10th Cir. 1983), *cert. denied*, 464 U.S. 934, 104 S.Ct. 339, 78 L.Ed.2d 307 (1983), the trial evidence tends to show the following relevant facts.

In the early morning hours of September 23, 1991, Oklahoma City police attempted to execute a search warrant at a suspected crack cocaine house in Oklahoma City, Oklahoma. As the officers broke down the front door, gun shots were fired from the inside of the house toward the door, and one officer was apparently injured and another was struck by flying glass. IV R. 21–23. The officers eventually entered the house and nine people came out and were arrested, including Brown. Id. at 37–38, 94. On the floor of the house, the officers found a loaded TEC–9 9mm semiautomatic gun with a round jammed between the chamber and the bolt. The magazine in the gun contained 28 live rounds of ammunition. In the living and dining rooms of the house, 9mm shell casings were found. Id. at 252; V R. 263–70. In a planter box the officers found a clip containing 36 live rounds. V R. 269, 271. A .22 caliber weapon was also found in the converted garage area, with nine live rounds in its chamber. IV R. 253. Subsequent ballistics tests indicated that projectiles and cartridge casings from the house had been fired from the TEC–9. V R. 304–06. Mr. Robertson, the firearms investigator who runs the Oklahoma City Police Department Ballistics Laboratory, testified that from the position where the rounds were found in the dining room, two rounds might have been fired by someone crouched behind the planter, but as to four or five other rounds, the shooter would have to have been farther out in another area. V R. 309–10. There was testimony that a fingerprint from Brown and a latent fingerprint from the ammunition clip were made by the same person. V R. 320, 336, 339–41.

The government called Sylvester Mays who lived at 1826 Northeast 48th Street in Oklahoma City, where the arrests in this case occurred. IV R. 55. Mays was arrested on September 23, 1991, when the police executed a search warrant at his house. He has an agreement with the government relating to his testimony and cooperation under which the federal government is not going to press charges on these events and the state is going to handle them. Id. at 56–57. Mays said he had been living at the house on 48th Street about six months or a year. He made an agreement with codefendant James Thomas for Thomas to occupy the house. They had sat in Mays' dining room and Thomas gave him some crack cocaine and asked Mays if he could "work at the house" and Mays agreed. Id. at 60. Thomas gave Mays $100 worth of cocaine in order to work in the house, which Mays explained as meaning selling crack cocaine there. Id. at 61. In return for this agreement, Mays was going to get cocaine. Thomas then immediately started selling cocaine out of the house and brought other people with him, including Jermaine Brown and Walter Roberson. Id. at 62. Mays identified Brown in court.

Mays testified that he had seen Brown at his home about three times between the time when they met and were arrested. He had seen Thomas give Brown a "lump sum" of crack cocaine and Brown would sell out of the home on 48th Street. Id. at 64. He had seen Thomas give Brown a big bag of cocaine and Jermaine was selling it and sold quite a bit that day to people that came to the door. Id. at 64. A typical transaction was that someone would knock at the door, Mays would answer and ask what they wanted, and then would get it from Brown, giving the crack cocaine to the people. The money was then given to Brown. The same thing was done when Thomas was there and Thomas would give Mays the dope and Mays would give Thomas the money. Id. at 65. In the house Mays had seen a 9mm gun and a .22 caliber gun. He saw Jermaine Brown handle a gun one particular day. Mays had also seen Thomas handle the guns. On one occasion, a friend of Mays came in and wanted some crack cocaine. This friend was a little intoxicated and he took a long time to tell Mays what he wanted. Brown pointed the 9mm gun at the man's head and told him to make up his mind or he would have to get out. Id. at 66–67, 105. Mays had also seen Brown handle the gun on other occasions. Id. at 68. Mays had obtained cocaine himself from Brown. Id. at 69.

Mays said that the evening of the arrest he had come back to the house and about three minutes later the police "just busted us." He said that Brown, Thomas and Walter Roberson were in the dining room. Also Regina

Riggs had been staying at the house. Mays was asked about the coming and going of different people from the house and was asked if Thomas was gone who was "left in charge with handling the dope and keeping the guns and—and the money?" Mays answered, "Jermaine." *Id.* at 74. Mays also was asked whether Brown was in the house when people were coming and going and buying crack cocaine and Mays answered that Brown was there. *Id.* at 75.

On cross-examination Mays admitted that he had told the arresting officers that the drugs belonged to Thomas; he said that Thomas, Regina and "another guy" had sold the drugs. *Id.* at 89–90. Mays said that he had seen Brown sell drugs at the house and that both Thomas and Brown were giving Mays free dope when Mays would bring them the money from a customer. *Id.* at 100, 102. Mays testified that the guns had to have been Thomas' guns but that Brown definitely was holding one gun and pointed the gun at a friend of Mays and told him that he had to make a choice on getting some cocaine or getting out. *Id.* at 105. On cross-examination Mays said that the making of the agreement by him with Thomas about use of his house was a week before the arrests on September 23, 1991. *Id.* at 106. Mays said that Brown showed up later on the same day that the arrangements were made. Thomas left and he came back and Jermaine Brown was with him. *Id.* at 108.

During cross-examination Mays said that he saw firearms which Thomas and Jermaine Brown had. *Id.* at 113. Mays testified he saw Jermaine Brown at his place three times, first on Tuesday or Wednesday before the arrests on Monday, September 23, then on Thursday or Friday of that week, and last on the following Monday on the day of the drug bust. *Id.* at 114–116. Mays was asked about who was helping in running the show at the home and he replied: "I was—transacted crack cocaine, I would take they [sic] money, and I would give it to James, or I would give it to—I would give it to Jermaine or James." *Id.* at 126–127.

Bruce Cooks was called by the government to testify about the events at the crack house of Mays. He had been in the county jail since the September 1991 arrests and had an agreement that no federal charges would be filed if he testified truthfully, but state charges for distribution were being prosecuted against him and he had entered a guilty plea to that charge. IV R. 202–03. Cooks had been to Mays' house on 48th Street a couple of times about two weeks before the arrests. He gave money to Kenneth Webb who purchased cocaine there from Thomas. Cooks first saw Jermaine Brown on Friday in the den area of the house. *Id.* at 208. On Saturday night Cooks was at the house about 7 o'clock and Thomas was upset because his guns were missing but they were relocated about 3 o'clock that Sunday morning. While Cooks was in the house at that time he said it was Regina and James Thomas selling dope and that he did not ever see Brown handle the dope but he did see him handle the guns. *Id.* at 212. He saw Brown with the firearm during the drug transactions. *Id.* at 213. Cooks testified that he never directly saw Jermaine Brown selling any drugs. *Id.* at 214.

However when his testimony before the grand jury was related, Cooks stated that on Friday night Brown did count some drugs out. *Id.* at 215, 239. Thomas was the one who was running the house and was the main source. *Id.* at 216. Cooks recalled that Sunday night Jermaine, Walter Roberson and Thomas came back to the house about 6 o'clock. *Id.* at 216. Then the police came and at that time Brown was sitting in a chair "cater-cornered from the front door," holding the black "Uzi," which had a clip in it. *Id.* at 218. Cooks heard shots inside the house. He did not see Brown fire the gun, but he had it and Cooks turned around and saw a big blue flame coming from the gun. *Id.* at 220–21, 230. Cooks admitted on cross-examination that he did not see who shot the gun. *Id.* at 227.

Codefendant Regina Riggs was called by the government. She testified that she was familiar with Sylvester Mays' house on 48th Street. It was about September 19 or 20, 1991, when she first became aware drugs were being sold there. She was taken there and Mays asked Thomas if they had what Riggs and her friends wanted and Mays

brought some drugs in. The drugs he brought were not what they wanted and Riggs went to Thomas and purchased them herself in the den. IV R. 135–36. Riggs was smoking cocaine herself and Bruce Cooks was selling crack cocaine at the house. *Id.* at 144.

On Sunday morning Thomas left and later returned about 6:00 p.m. and had Jermaine Brown, Carlos and Walter Roberson with him. This was the first time that Riggs had met Brown. *Id.* at 145. Carlos came in with Thomas and had what seemed like quite an amount of dope, which he gave to Thomas. Thomas had the guns and headed to the kitchen. Jermaine Brown asked Thomas to let him see the gun and Brown was playing with it and then returned it to Thomas. *Id.* at 146–49. At one time Riggs saw Thomas throw some drugs to Brown. This was the only occasion when she saw Brown handle drugs. *Id.* at 151. Sylvester Mays came in while Brown had the bag of drugs and asked Brown if he could have a "rock"; Brown said, "[n]o, this ain't mine; this is [Thomas']" and "I can't do that." Brown thought a moment and then opened the bag and gave Mays one rock. *Id.* at 152.

At about that time, Riggs heard gun shots and windows breaking. She saw Brown bent down. Thomas pulled the gun out of Brown's hand and started firing it. It had been jammed. *Id.* at 153. Riggs did not see Brown fire any shots, but she saw him hold the gun. After Thomas grabbed the gun, Riggs saw Thomas fire about five shots. *Id.* at 155.

Riggs had been at the house that weekend but she said she did not see Brown there until Sunday about 6:00 p.m. *Id.* at 169, 173. Riggs said she was involved in Thomas' operation. *Id.* at 194. When Jermaine Brown, Roberson and Thomas came on Sunday evening, some other men followed in another car. Brown was not carrying anything. Riggs did not see Brown cutting crack cocaine, delivering it to the door, or handling money for the transactions. Except when he gave Mays a rock out of the bag, Riggs did not see Brown handling the drugs at any other time. *Id.* at 176–77. Riggs said that Brown did not use the cocaine. *Id.* at 180.

Defendant Jermaine Brown testified in his own defense. He said he was 18 years of age when the offense occurred and he lives in Los Angeles, California, with his grandmother. He had been in Oklahoma City only about two weeks and a couple of days before his arrest. V R. 430–31. Brown had been attending the Martin Luther King University of Medicine and Science, studying to be a physician's assistant for about nine months. Brown said he came to Oklahoma to visit James Thomas. The first time he was at the house where he was arrested was on September 20 or 21. *Id.* at 437. Walter Roberson and Thomas had picked him up and taken him to that location. He did not see any weapons in the car, but did notice a clip. *Id.* at 441. Brown identified an exhibit looking like the clip he saw in the car. He had picked up the clip, moved it and put it down again. *Id.* at 442. They went to Mays' house then, which Brown had been into earlier. This time Brown did go in the house; he saw Roberson place the clip from the car in a paper bag and then Roberson walked to the house. There were some people there whom Brown did not recognize. *Id.* at 444–45. After five or six minutes, Brown heard breaking of glass in one of the back rooms and heard three shots hitting the walls. *Id.* at 447. He fell to his knees and started crawling toward the back door. *Id.* at 448. Brown said he did not handle the gun testified about in the trial. He also denied that he had handled any drugs while he was there and said he did not sell any drugs. He denied pointing a weapon at anyone, or standing guard over drugs and weapons and he did not answer the door. Brown said that the first time he was introduced to Mays, Riggs or Cooks was the night of the drug bust. *Id.* at 463–64.

The defense also called Kenneth Wilky, a homicide investigator with the Oklahoma City Police Department. He testified that he interviewed Mays about 3:30 a.m. on September 23—the morning of the drug bust. Mays did not make any reference to Jermaine Brown. Mays said there were other people assisting Thomas in distributing drugs out of his house, giving only the first name of a girl named "Gina." V R. 401.

Police officer Ron Mitchell with the Oklahoma City Police Department was called by defendant. On September 24, 1991, he interviewed Mays during his investigation and said Mays did make reference to Jermaine Brown. Mays placed Jermaine in the dining room on the east side of the table just prior to the shooting. *Id.* at 391. Mitchell did not recall that Mays said that Brown sold any drugs. Mitchell also did not recall Mays saying that Brown held and played with the guns in the house, and Mitchell did not recall Mays saying Brown used the weapons to threaten a friend of Mays. *Id.* at 392. Mays said the guns and drugs belonged to James Thomas and that "Gina" was selling drugs for Thomas and would "normally" handle the actual sale. *Id.* at 393. Mays said that Bruce (Cooks) was the doorman. On cross, Mitchell said his investigation focused on the shooting aspect of the case and where everybody was inside the home at the time of the shooting. *Id.* at 394–95. Mays said that James (Thomas), Jermaine and Walter (Roberson) took control of the house. Mays said Gina was used to actually sell dope. Thomas, Brown and Roberson would be close by overseeing what was going on. Mays said that Thomas had two guns, one a "nine" and one a .22. *Id.* at 396.

Last, the defense called Walter Roberson, one of the nine people arrested in the drug bust. He testified that he was at Mays' house when the search occurred there on the night of September 22–23, 1991. He had met Jermaine Brown through friends, but Brown had not been in Oklahoma City long, perhaps a week or less. V R. 408–09. Brown had been staying for a few nights at Roberson's sister's house where Roberson was staying. Roberson said he did not know Sylvester Mays. Roberson and Jermaine Brown drove over to Mays' house. To Roberson's knowledge, Brown was not involved in drug trafficking. *Id.* at 412–13. Roberson did not see Brown handling any drugs or guns. *Id.* at 414. After Roberson had been at the house for about five minutes, the glass breaking and gun fire began. Roberson's reason for going to this house was to see a girl. *Id.* at 420.

## II

The indictment was filed October 16, 1991, charging in Count 1 a conspiracy from on or about September 14, 1991, until on or about September 23, 1991, at Oklahoma City, Oklahoma, among defendants Jermaine Brown, James Thomas (later identified as John Dailey) and Regina Riggs; that they conspired to possess in excess of 50 grams of cocaine base, a Schedule II controlled substance, with intent to distribute the drug in violation of 21 U.S.C. § 841(a)(1), and to distribute the drug, the conspiracy charged being in violation of 21 U.S.C. § 846. Count 2 alleged that the same defendants possessed with intent to distribute approximately 80 grams of a mixture or substance containing a detectable amount of cocaine base on or about September 23, 1991, at Oklahoma City, in violation of 21 U.S.C. § 841(a)(1). Count 3 charged that on or about September 23, 1991, the same defendants did knowingly use or carry a firearm, a 9mm Model TEC-9, during and in relation to a drug trafficking crime, the alleged conspiracy, in violation of 18 U.S.C. § 924(c)(1) and 18 U.S.C. § 2. Count 4 alleged that from about September 14, 1991, until on or about September 23, 1991, the same defendants knowingly and unlawfully controlled a building, described premises located in Oklahoma City, and made the premises available for unlawfully storing and distributing cocaine base in violation of 21 U.S.C. § 856(a)(2) and 18 U.S.C. § 2.

The jury trial of Thomas in December 1991 resulted in his conviction on all counts. Riggs pled guilty to an information charging her as a felon in possession of a firearm and the indictment as to her was dismissed on February 7, 1991, at the time of her sentencing on the superseding charge. Defendant Jermaine Brown was found guilty by a jury on the four counts of the indictment after his trial in January 1992.

The presentence report on Brown proposed a total offense level of 36. At issue on this appeal is the court's adoption of the report's suggestion of a two-level enhancement pursuant to U.S.S.G. § 3B1.1(c) for an "Aggravating Role" of defendant Brown in the offenses. Paragraph 18 of the report said that the investigative report indicates

that codefendant Dailey (Thomas) was "the manager of the cocaine base distribution group"; however when Dailey was away from the premises, the investigative report said, "Brown acted as the manager of the operation." It was suggested that based "on this comanager role, the two-level enhancement" is applicable to Brown.

Defendant Brown filed a Sentencing Memorandum, Doc. 129, objecting to the increase and also submitting a request for a decrease for a "minor participant" role in the operation pursuant to § 3B1.2(b) respecting the "Mitigating Role" of a defendant. The trial judge rejected this request of Brown and instead made a two-level enhancement as the presentence report suggested. The denial of the downward adjustment is also at issue on this appeal.

The sentence, premised on the enhancement and the resulting offense level of 36, was for 24½ years plus (295 months). This included 235 months' imprisonment on Counts 1, 2 and 4 to run concurrently and 60 months' imprisonment on Count 3 to run consecutively to the other counts. The court also imposed 5 years of supervised release (5 years on Counts 1 and 2, and 3 years on Counts 3 and 4, all to run concurrently) and a $200 special assessment, which was waived due to Brown's inability to pay.

Defendant Brown appeals, contending first that the district court erred in making the two-level enhancement for Brown's sentence as a "manager" of the operation and maintaining that he was in fact a "minor participant" in the crime and therefore should instead have been given a two-level downward adjustment pursuant to U.S.S.G. § 3B1.2(b), which it was error to deny. Second, Brown challenges the court's denial of his motion for a judgment of acquittal, maintaining that the evidence was insufficient on all counts to support the jury's verdict. We address each of Brown's arguments in turn.

### III

#### A. Brown's Enhanced Prison Sentence

 The government bore the burden of proving by a preponderance of the evidence the predicate facts that Brown was a manag-

er in the drug conspiracy alleged. *United States v. Mays*, 902 F.2d 1501, 1502–03 (10th Cir.1990). The defendant had the burden of proving by a preponderance of the evidence that he played only a minor role in the drug operation. *United States v. Maldonado-Campos*, 920 F.2d 714, 717 (10th Cir.1990). We review the trial court's factual findings in support of its sentence under the clearly erroneous standard. 18 U.S.C. § 3742(e); *United States v. Morgan*, 936 F.2d 1561, 1573 (10th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1190, 117 L.Ed.2d 431 (1992) ("since Defendant is challenging the sufficiency of evidence, a primarily factual question, the clearly erroneous standard applies"). The court's findings "will not be reversed unless they are without factual support in the record, or unless after reviewing all the evidence, we are left with the definite and firm conviction that a mistake has been made." *Morgan*, 936 F.2d at 1573.

U.S.S.G. § 3B1.1(c) provides for an increase in the offense level by two levels "if the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b). . . ." With respect to the application of § 3B1.1(c), Application Note 3 to § 3B1.1 provides, in relevant part:

3. In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling. Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. This adjustment does not apply to a defendant who merely suggests committing the offense.

In *United States v. Backas*, 901 F.2d 1528, 1529 (10th Cir.), *cert. denied*, 498 U.S. 870, 111 S.Ct. 190, 112 L.Ed.2d 152 (1991), we noted that the issue of the sufficiency of the evidence to support an enhancement under § 3B1.1(c) presents a primarily factual issue and our review is under the clearly erroneous standard. However, a challenge to the conclusion reached that one is a supervisor as defined in the Guidelines is primarily legal and the trial court's determination on it is reviewed under a *de novo* standard. *Id.* at 1530. In *Backas* we reviewed the record and concluded that the evidence was sufficient to establish that the defendant regularly sold drugs from a house, another person was in effect his doorman who admitted customers and screened them, and the doorman was paid for his activities; we held that the court could have concluded by a preponderance of the evidence that the defendant had power of direction or supervision over the doorman and thus the trial judge's finding that Backas was a supervisor was not clearly erroneous. *Id.* at 1529–30.

We further held that the conclusion that such activities legally qualified Backas as a supervisor as defined in the Guidelines was not error, upon *de novo* review. We stated that in order to be a supervisor, "one needs merely to give some form of direction or supervision to someone subordinate in the criminal activity...." *Id.* at 1530. *See also United States v. Reid*, 911 F.2d 1456, 1464 (10th Cir.1990), *cert. denied*, 498 U.S. 1097, 111 S.Ct. 990, 112 L.Ed.2d 1074 (1991) (for § 3B1.1 to apply, defendant must have exercised some degree of control over others involved in commission of the offense or he must have been responsible for organizing others for the purpose of carrying out the crime; this requirement is implicit in the terms organizer, leader, manager and supervisor). Also a managerial or supervisory role was found with respect to a defendant who, *inter alia*, effectively ran the operation while

her husband was ill in *United States v. Brooks*, 957 F.2d 1138, 1152 (4th Cir.1992), *cert. denied*, —— U.S. ——, 112 S.Ct. 3051, 120 L.Ed.2d 917 (1992), which bears similarity to the comanager activity of Brown here when Thomas was away, according to Mays' testimony. IV R. 74.

Brown argued to the district court that he was not an "organizer, leader, manager, or supervisor" within the meaning of § 3B1.1(c) but, instead, only a "minor participant," i.e., "[a] participant who is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2, Application Note 3. The district judge rejected Brown's argument, stating:

> The evidence from the trial substantially supports the enhancement. Justice clearly negates the position that Mr. Brown was a minor participant or anything less than he is being acredited [sic] for as written.

III R. 12. We feel that the judge made an implicit finding that Brown was a "manager" within the meaning of § 3B1.1(c) as well as his stated finding that Brown was not a "minor participant" within the meaning of § 3B1.2(b).

We believe the record sufficiently supports the trial judge's findings, although the proof on the enhancement for being a manager is not strong. As noted, Mays was asked if Thomas was gone who was left in charge of handling the dope and keeping the guns and money, and Mays replied: "Jermaine." IV R. 74. Mays was earlier asked about a typical situation and he said that if someone knocked on the door, Mays might answer and he would ask what they wanted. Mays would get the drugs from Brown, give the crack cocaine to the people and give the money to Brown. Mays also did this when Thomas was present. *Id.* at 65, 77–78. Brown also gave cocaine to Mays for his personal use, which was part of the agreement. *Id.* at 69.[1] Mays had seen both

---

1. Brown's counsel relies in part on one portion of Mays' testimony. Mays said that he got upset because at the beginning Brown was not giving Mays cocaine and Brown did not know about the arrangement that Mays would receive cocaine for his handling the transactions at the door. After this was talked over and Thomas spoke with Brown about it, this was taken care of and

from then on Brown started giving more crack cocaine to Mays. IV R. 78. Brown's counsel argues that Thomas' control is shown by this testimony, as well as Brown's working merely as an inferior, not as a manager or comanager.

The argument has some force. However, the trial judge may well have reasonably inferred

Thomas and Brown handle the guns. Mays testified that one day a friend came in wanting cocaine. He was taking a long time to tell Mays what he wanted. Brown pointed the 9mm gun at the man and told him to make up his mind or he was going to leave. *Id.* at 66, 105. As Mays told the police officer, the guns "had to have been James Thomas's guns." *Id.* at 105.[2]

Accordingly the judge's implicit finding that Brown was a manager for purposes of the two-level adjustment was not clearly erroneous. *See Backas,* 901 F.2d at 1529–30. The judge's application of the Guidelines to the facts, reviewed on a *de novo* basis, was not in error. *Id.* at 1530. Moreover what we have said likewise shows that there was a sufficient evidentiary basis for the trial judge's rejection of the request to adjust downward by two levels on the basis that Brown was only a minor participant in the offenses.

### B. The Denial of Brown's Motion for Judgment of Acquittal

■ In reviewing the denial of a motion for judgment of acquittal, we must determine whether the evidence at trial was sufficient to permit a "rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). In making this determination, we view the evidence and any inferences that may reasonably be drawn from it in the light most favorable to the government. *United States v. Harrod,* 981 F.2d 1171, 1174 (10th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2350, 124 L.Ed.2d 259 (1993); *United States v. Edgmon,* 952 F.2d

1206, 1209 (10th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3037, 120 L.Ed.2d 906 (1992). However, to support a conviction the evidence must be substantial and must not raise a mere suspicion of guilt. *United States v. Troutman,* 814 F.2d 1428, 1455 (10th Cir.1987). Moreover mere presence at the scene of criminal activity is not enough to support a criminal conviction.

■ On Count 1, Brown was convicted of conspiracy to possess cocaine base with intent to distribute and to distribute the drug in violation of 21 U.S.C. § 846. To sustain the conviction, the government had to prove that Brown "agreed to violate the law, that [he] knew at least the essential objectives of the conspiracy, and he knowingly and voluntarily became a part of the conspiracy." *United States v. Williams,* 923 F.2d 1397, 1402 (10th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2033, 114 L.Ed.2d 118 (1991). "[A]n express agreement [to possess and distribute cocaine] is not required. A tacit agreement is sufficient." *United States v. Hartsfield,* 976 F.2d 1349, 1354 (10th Cir. 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1344, 122 L.Ed.2d 727 (1993). " '[T]he jury may presume that a defendant is a knowing participant in the conspiracy when he acts in furtherance of the objective of the conspiracy.' " *United States v. Brown,* 943 F.2d 1246, 1250 (10th Cir.1991).

■ There is evidence indicating that Thomas and Mays entered into an understanding to use Mays' house as a crack house and shortly thereafter Brown arrived at the residence with Thomas and Brown assisted in the drug sales operations. IV R. 58–64. Brown's subsequent involvement in the oper-

---

that nonetheless Brown had sufficient authority in the informal structure to be found a manager, or a comanager along with Thomas.

2. The fact that the court's findings were apparently based essentially on Mays' testimony, seemingly accepted over considerable contradictory testimony, does not demonstrate that the findings were clearly erroneous. In *Anderson v. Bessemer City,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985), the Court stated:

Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable fact-finder would not

credit it. Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination. *See, e.g., United States v. United States Gypsum Co., supra* [333 U.S. 364], at 396 [68 S.Ct. 525, at 542, 92 L.Ed. 746]. *But when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.*

*Id.* at 575, 105 S.Ct. at 1512 (emphasis added).

ations was explained. Brown's activities included possession of drugs, drug proceeds, participation in drug sales, and the handling of weapons. *Id.* at 64–65, 73–74. The evidence was sufficient to permit the jury to infer that Brown had agreed, tacitly or explicitly, to join the drug conspiracy and to further its purposes and goals. It was not error for the trial judge to deny Brown's motion for judgment of acquittal on Count 1. *Hartsfield,* 976 F.2d at 1354; *Brown,* 943 F.2d at 1250.[3]

■ On Count 2, Brown was convicted of possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). To sustain the conviction, the government was required to prove that Brown knowingly possessed cocaine and intended to distribute it. *United States v. Marchildon,* 519 F.2d 337, 341 (8th Cir.1975). As noted, there was ample evidence of knowing possession and distribution of cocaine by Brown in the course of the drug conspiracy. IV R. 64–65, 74. Accordingly, the jury's verdict on Count 2 is supported by the evidence, and the district court did not err in refusing to set the verdict aside.

■ On Count 3, Brown was convicted of using or carrying a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1). "Use" of a firearm under the foregoing statute includes "ready access" to the firearm if the firearm "was an integral part of [defendant's] criminal undertaking and its availability increased the likelihood that the criminal undertaking would succeed." *United States v. McKinnell,* 888 F.2d 669, 675 (10th Cir.1989). The government must show that (1) Brown used or carried a firearm, and (2) his use or carrying was during and in relation to a drug trafficking crime. *See Smith v. United*

States, —— U.S. ——, ——, 113 S.Ct. 2050, 2053, 124 L.Ed.2d 138 (1993); *see also United States v. Sullivan,* 919 F.2d 1403, 1432 (10th Cir.1990).

■ As noted, there is evidence here that Brown had access to and personally possessed and displayed firearms during the drug operations, including one incident in which he pointed a gun at the head of a drug customer. IV R. 66–67, 105. There was further evidence that Brown had possession of a gun at about the time the police raid on the crack house began. *Id.* at 152–54. In light of all the evidence, we find no merit in Brown's challenge to his conviction for violation of 18 U.S.C. § 924(c)(1).[4]

## IV

### Validity of Count 4 of the Indictment

On Count 4, Brown was convicted of a violation of 21 U.S.C. § 856(a)(2). In this appeal, he argues that the proof was insufficient to support a conviction under the statute. However, we find a more fundamental defect respecting this conviction which is dispositive.

Section 856(a)(2) makes it unlawful to

(2) manage or control any building, room, or enclosure, *either as an owner, lessee, agent, employee, or mortgagee,* and knowingly and intentionally rent, lease, or make available for use, with or without consideration, the building, room, or enclosure for the purpose of unlawfully manufacturing, storing, distributing, or using a controlled substance.

*Id.* (emphasis added).

We note, however, that Count 4 of the instant indictment contains no allegation with respect to any of the terms in the statute

---

3. Brown's reliance on conflicts between the testimony of Mays and that of Riggs and other witnesses is unavailing. The jury could legitimately base its verdict on the testimony of an accomplice such as Mays alone. *United States v. Cox,* 934 F.2d 1114, 1121 (10th Cir.1991) ("a jury may convict based on the uncorroborated testimony of a co-conspirator"). However if the testimony of an accomplice is uncorroborated, the court must instruct the jury that testimony of accomplices must be carefully scrutinized,

weighed with great care and received with caution. *United States v. Birmingham,* 447 F.2d 1313, 1317 (10th Cir.1971). The trial judge here gave the essentials of this instruction (Instruction No. 12).

4. We feel it clear that here the evidence supports an inference of use of the weapon within the everyday meaning of the term "use" adopted by the Court with respect to § 924(c)(1) in *Smith. See Smith,* —— U.S. at ——, 113 S.Ct. at 2053.

emphasized above.[5] Those terms make it clear that this offense is committed when the proscribed acts such as managing or controlling any building, etc., and knowingly and intentionally renting, etc., or making it available for use for the unlawful purposes are committed by one "as an owner, lessee, agent, employee, or mortgagee...." Action in one of such capacities has been held to be an essential element of the offense of violation of § 856(a)(2). *United States v. Chen*, 913 F.2d 183, 187 (5th Cir.1990); *see also United States v. Cooper*, 966 F.2d 936, 942 n. 8 (5th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 481, 121 L.Ed.2d 386 (1992). In *Chen*, the Fifth Circuit set out the essential elements of a violation of § 856(a)(2):

> To convict her under § 856(a)(2), the jury had to find that Chen (1) managed or controlled the Della Motel (2) *either as an owner, lessee, agent, employee or mortgagee and* (3) knowingly and intentionally rented, leased or made available for use for compensation, the building for the purpose of unlawfully storing, distributing and using a controlled substance.

913 F.2d at 187 (emphasis added). Thus an essential element of the offense was not charged in the instant indictment.

■ This defect has not been urged by the defendant-appellant before us and we find no reference in our record to its being raised below. However, such a critical omission is one which should be noted by an appellate court *sua sponte* as plain error. *E.g., United States v. Meacham*, 626 F.2d 503, 509 (5th Cir.1980) (stating that the language of Fed.R.Crim.P. 12(b)(2) requires that failure of indictment to charge offense be noticed by district courts and appellate courts *sua sponte*); *United States v. Clark*, 412 F.2d 885, 887–88 (5th Cir.1969); *Chappell v. United States*, 270 F.2d 274, 276 (9th Cir.1959); *see also, e.g., United States v. Shoup*, 608 F.2d 950, 960 (3d Cir.1979) (stating general rule that court must notice in-dictment's defect of failure to charge a federal offense as jurisdictional).

■ We have noted that here the trial judge did include within the essential elements instruction to the jury on Count 4 a statement that the government must prove, along with the first and third elements, a second element that "the defendant managed or controlled the building either as an owner, lessee, agent, employee or mortgagee...." Instruction No. 33. However the fundamental problem of the defect in the indictment is not solved by the jury instruction because "[j]ury instructions may not include an element of an offense if that element was not charged in the indictment." *United States v. Peterman*, 841 F.2d 1474, 1477 (10th Cir. 1988), *cert. denied*, 488 U.S. 1004, 109 S.Ct. 783, 102 L.Ed.2d 774 (1989). This was a charge to the petit jury, while the mandate of "inclusion of all elements ... derives from the Fifth Amendment, which requires that the *grand jury* have considered and found all elements to be present." *United States v. Hooker*, 841 F.2d 1225, 1230 (4th Cir.1988) (en banc) (emphasis added); *see Stirone v. United States*, 361 U.S. 212, 217, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960) (holding variance "destroyed the defendant's substantial right to be tried only on charges presented in an indictment returned by a grand jury"). Further, "and of paramount importance, a sufficient indictment is required to implement the Fifth Amendment guaranty and make clear the charges so as to limit a defendant's jeopardy to offenses charged by a group of his fellow citizens, and to avoid his conviction on facts not found, or perhaps not even presented to, the grand jury that indicted him." *United States v. Radetsky*, 535 F.2d 556, 562 (10th Cir.), *cert. denied*, 429 U.S. 820, 97 S.Ct. 68, 50 L.Ed.2d 81 (1976), *overruled in part on other grounds by United States v. Daily*, 921 F.2d 994, 1004 & n. 11 (10th Cir.1990); *see Russell v. United States*, 369 U.S. 749, 770, 82 S.Ct. 1038, 1050, 8 L.Ed.2d 240 (1962).

---

5. In pertinent part, Count 4 charged that:
 the defendants herein, did knowingly and unlawfully control a building, to-wit: the premises located at 1826 Northeast 48th Street, Oklahoma City, Oklahoma, [and] made such premises available for use for the purpose of unlaw-fully storing and distributing controlled substances, namely cocaine base, a Schedule II narcotic drug controlled substance.
 All in violation of Title 21, United States Code, Section 856(a)(2) and Title 18, United States Code, Section 2.

It is true that where there is a post-verdict challenge to an indictment asserting the absence of an element of the offense, it has been held the indictment will be sufficient if it contains "words of similar import" to the element in question. *United States v. Vogt,* 910 F.2d 1184, 1201 (4th Cir.1990), *cert. denied,* 498 U.S. 1083, 111 S.Ct. 955, 112 L.Ed.2d 1043 (1991). *See generally United States v. Mason,* 440 F.2d 1293, 1296–97 (10th Cir.), *cert. denied,* 404 U.S. 883, 92 S.Ct. 219, 30 L.Ed.2d 165 (1971). "Upon a proceeding after verdict at least, no prejudice being shown, it is enough that the necessary facts appear in any form, or by fair construction can be found within the terms of the indictment." *Hagner v. United States,* 285 U.S. 427, 433, 52 S.Ct. 417, 420, 76 L.Ed. 861 (1932). However, we have considered the language of the indictment here and there is no wording of similar import to the requirement that the proscribed acts be committed "either as an owner, lessee, agent, employee or mortgagee."

■ Here the failure of the indictment to allege all the essential elements of an offense under § 856(a)(2) is a jurisdictional defect requiring dismissal, despite citation of the underlying statute in the indictment. *See United States v. Crockett,* 812 F.2d 626, 629 & n. 3 (10th Cir.1987); *United States v. Broncheau,* 597 F.2d 1260, 1262 n. 1 (9th Cir.), *cert. denied,* 444 U.S. 859, 100 S.Ct. 123, 62 L.Ed.2d 80 (1979). "[T]he absence of prejudice to the defendant does not cure what is necessarily a substantive, jurisdictional defect in the indictment." *United States v. Smith,* 553 F.2d 1239, 1242 (10th Cir.1977).

In sum, we are convinced that we must notice the critical omission of this essential element from the indictment handed down by the grand jury. Therefore, the conviction and sentence on Count 4 must be vacated.

## V

We perceive no reason why vacating the conviction and sentence on Count 4 would affect the validity of the remaining convictions and sentences on Counts 1, 2 and 3. Accordingly, the convictions and sentences on Counts 1, 2 and 3 are **AFFIRMED**. The

conviction and sentence on Count 4 are **VACATED** and that count is remanded with directions that it be dismissed.