**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Michael MANDILAKIS, Defendant–**
**Appellant.**

**No. 93–1219.**

United States Court of Appeals,
Tenth Circuit.

April 26, 1994.

Harold A. Haddon (Ty Gee, with him on the briefs), of Haddon, Morgan & Foreman, P.C., Denver, CO, for defendant-appellant.

Robert Gay Guthrie (James R. Allison, Interim U.S. Atty., with him on the brief), Asst. U.S. Atty., for plaintiff-appellee.

Before SEYMOUR, Chief Judge, TACHA, Circuit Judge, and VRATIL,* District Judge.

TACHA, Circuit Judge.

Michael Mandilakis pleaded guilty to receipt of stolen property in violation of 18 U.S.C. §§ 2315 and 2, and the district court sentenced him to thirty-three months' imprisonment. Mr. Mandilakis challenges his sentence alleging that the district court improperly increased his offense level by two points pursuant to United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 3B1.1(c) for being an "organizer, leader, manager, or supervisor" of the criminal activity. We exercise jurisdiction under 18 U.S.C. § 3742(a) and affirm.

## I. Background

From 1982 to 1985 Mr. Mandilakis served as the chief executive officer of Putnam and Company ("Putnam"), a builder of luxury homes in Lakewood, Colorado. Between November 1984 and September 1985, Mr. Mandilakis supervised Danielle Hacker, a secretary and office manager at Putnam.

Ms. Hacker later left Putnam and in January 1987 began working for American Express Information Services ("American Express")[1] as a credit analyst in Phoenix, Arizona. American Express issues travelers' checks, money orders and moneygrams in the company name. American Express has established a principal-agent relationship with numerous vendors throughout the United States, authorizing these vendors to issue, upon receipt of good funds from purchasers, American Express travelers' checks, money orders and moneygrams. As part of its contract with American Express, each vendor is required to enter into a trust agreement which provides that all funds are to be held by the vendor in trust until paid to American Express. In the event of overpayment by the vendor, a "collector" at American Express completes a Payment Product Check Request and submits it for approval, along with supporting documentation of the vendor's claimed overpayment. The vendor is then reimbursed for the overpayment.

In March 1988, Ms. Hacker was promoted to the position of collector at the American Express office in Englewood, Colorado. As a collector, she learned how to issue a check for overpayment to a vendor. When she found herself experiencing financial problems and needing $1,000 to pay her rent in November 1988, she telephoned Mr. Mandilakis, who was living in Ohio, and asked him to receive a fraudulent overpayment check and then to return the proceeds to her. Ms. Hacker sent this overpayment check to Mr. Mandilakis, who did in fact return some of the proceeds to her. Mr. Mandilakis apparently liked this arrangement because, according to Ms. Hacker, he then began pressuring her to send more money, though he never threatened or intimidated her.

Between November 1988 and June 1992, Ms. Hacker fraudulently issued 128 checks drawn on American Express totalling $2,644,010.85. The checks were made payable to either fictitious vendors or Mr. Mandilakis. At the direction of Mr. Mandilakis, Ms. Hacker mailed the checks via the United

* The Honorable Kathryn H. Vratil, District Judge, United States District Court for the District of Kansas, sitting by designation.

1. American Express Information Services is a division of American Express Company. In April 1992, however, American Express Information Services became First Data Corporation. For simplicity, this opinion will refer to the company as "American Express."

States Postal Service or airborne express to Mr. Mandilakis in Ohio. Upon receiving the checks, Mr. Mandilakis deposited them into several Ohio bank accounts that he had established for himself and the fictitious vendors. Mr. Mandilakis controlled all these bank accounts. Mr. Mandilakis also recruited Stephen Wright to act as a "straw payee" in receiving some of the payments. Mr. Wright was unaware of the criminal nature of the scheme.

Of the fraudulently obtained $2.6 million, Ms. Hacker claims that Mr. Mandilakis only returned $200,000 to her. Mr. Mandilakis states that he returned $900,000. The record corroborates neither version. In any event, Mr. Mandilakis told the United States Probation Department that he spent $350,000 of his ill-gotten gains to renovate his home, $150,000 on attorneys fees and approximately $1.2 million on his Ohio real estate development business. Thus, according to his own statements, Mr. Mandilakis retained at least $1.7 million from the scheme.

Mr. Mandilakis pleaded guilty to receipt of stolen property in violation of 18 U.S.C. §§ 2315 and 2, and Ms. Hacker pleaded guilty to interstate transportation of stolen securities in violation of 18 U.S.C. §§ 2314 and 2. Finding Mr. Mandilakis to be a "leader" or "supervisor" of the criminal activity, the district court increased his offense level by two points pursuant to U.S.S.G. § 3B1.1(c) and sentenced him to thirty-three months' imprisonment.

## II. Discussion

■ Mr. Mandilakis challenges his sentence on two related grounds. First, he contends that the district court erred in finding that he was a "leader" or "supervisor" of the criminal scheme for purposes of making a two-point upward adjustment under U.S.S.G. § 3B1.1(c). We accept the district court's factual findings on this point unless clearly erroneous. *United States v. Lowder*, 5 F.3d 467, 470 (10th Cir.1993). Under the clearly erroneous standard, we will not reverse the district court's finding unless it is "without factual support in the record, or unless after reviewing all the evidence, we are left with the definite and firm conviction that a mistake has been made." *United States v. Brown*, 995 F.2d 1493, 1500 (10th Cir.) (internal quotations omitted), *cert. denied*, —— U.S. ——, 114 S.Ct. 353, 126 L.Ed.2d 317 (1993).

Pursuant to § 3B1.1(c), a defendant's offense level is increased by two points "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b)."[2] U.S.S.G. § 3B1.1(c). "In order to be a supervisor, one needs merely to give some form of direction or supervision to someone subordinate in the criminal activity...." *United States v. Backas*, 901 F.2d 1528, 1530 (10th Cir.), *cert. denied*, 498 U.S. 870, 111 S.Ct. 190, 112 L.Ed.2d 152 (1990). "Among the factors which a court may consider are the defendant's exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity and the degree of control and authority exercised over others." *United States v. Hanif*, 1 F.3d 998, 1004 (10th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 573, 126 L.Ed.2d 472 (1993); *see also Brown*, 995 F.2d at 1500 (citing § 3B1.1 Application Note 3); *United States v. Mays*, 902 F.2d 1501, 1503 n. 5 (10th Cir.1990) (same).

■ Upon our review of the record, we find sufficient evidence to support the district court's finding that Mr. Mandilakis exercised a leadership or supervisory role in the offense pursuant to § 3B1.1(c). Though Ms. Hacker initially contacted Mr. Mandilakis, asking him to receive an overpayment check and return the proceeds to her so that she could make her $1,000 rent payment, the evidence indicates that the scheme increased dramatically in size due to Mr. Mandilakis's initiative. He pressured Ms. Hacker, his

---

**2.** Sections 3B1.1(a) and (b) provide for greater sentence enhancements for organizers, leaders, managers and supervisors of a criminal activity that involves five or more participants or that is otherwise extensive.

former secretary, to send more checks.[3] He also directed Ms. Hacker as to when, where and how to send the checks. He recruited Mr. Wright as a "straw payee."[4] Further, Mr. Mandilakis established and controlled the fictitious bank accounts and retained at least 1.7 of the pilfered $2.6 million. The district court's finding was not clearly erroneous.

■ Mr. Mandilakis also argues that the district court erred by increasing his offense level under § 3B1.1(c) for being an "organizer, leader, manager, or supervisor" when his offense level already had been increased under § 2B1.2(b)(4)(B)[5] for "more than minimal planning." According to Mr. Mandilakis, this constitutes impermissible double counting because being an "organizer, leader, manager, or supervisor" necessarily requires "more than minimal planning." "We review de novo the district court's interpretation of the Sentencing Guidelines." *Lowder*, 5 F.3d at 470.

*United States v. Smith*, 13 F.3d 1421 (10th Cir.1994), is directly on point.[6] We held in *Smith* that the two point upward adjustment for "more than minimal planning" and the two point upward adjustment for acting as an

"organizer, leader, manager, or supervisor" may be applied in tandem without constituting impermissible double counting. *Id.* at 1429. The district court therefore did not err in increasing Mr. Mandilakis's offense level by two points under both § 2B1.2(b)(4)(B) and § 3B1.1(c).

We AFFIRM.

---

**3.** Mr. Mandilakis contends that the evidence fails to show that he pressured Ms. Hacker into sending more money. To support this contention, he refers to several comments made by Ms. Hacker's sentencing judge. Mr. Mandilakis's attempt to recharacterize the judge's comments at Ms. Hacker's sentencing hearing is unavailing. The thrust of the sentencing judge's statements was that Mr. Mandilakis did not *coerce* Ms. Hacker to commence or continue the scheme. Ms. Hacker's sentencing judge never intimated that Mr. Mandilakis did not attempt to influence Ms. Hacker to expand the scheme. In fact, the judge specifically stated: "I see no support for any [downward] departure based on any indication that she was coerced into this transaction or into any part of it, although Mr. Mandilakis *did exercise influence after the scheme began.*"

**4.** Citing cases from four circuit courts of appeal, Mr. Mandilakis argues that his recruitment of Mr. Wright cannot be considered in determining whether his sentence should be enhanced for acting as an "organizer, leader, manager, or supervisor" under § 3B1.1(c) because Mr. Wright is not a "criminally responsible" party, but merely an unwitting accomplice. The cases cited by Mr. Mandilakis are inapposite. They do not hold that the recruitment of a person who is not "criminally responsible" is irrelevant to the

§ 3B1.1(c) determination. Rather, they simply hold that § 3B1.1 should be used to enhance a defendant's sentence only "when the offense is committed by more than one criminally responsible person." *United States v. Anderson*, 942 F.2d 606, 614 (9th Cir.1991); *see also United States v. Markovic*, 911 F.2d 613, 616–17 (11th Cir.1990); *United States v. DeCicco*, 899 F.2d 1531, 1535–37 (7th Cir.1990); *United States v. Carroll*, 893 F.2d 1502, 1507–09 (6th Cir.1990). Here, Mr. Mandilakis and Ms. Hacker are both "criminally responsible" and Mr. Mandilakis's recruitment of Mr. Wright may be considered in determining whether Mr. Mandilakis is an "organizer, leader, manager, or supervisor" of the "participants" (i.e., Mr. Mandilakis and Ms. Hacker) in the offense.

**5.** Section 2B1.2(b)(4)(B) has been deleted by consolidation with § 2B1.1 in the 1993 Sentencing Guidelines.

**6.** Prior to oral argument, the parties submitted as supplemental authority *Smith* and *United States v. Flinn*, 18 F.3d 826 (10th Cir.1994). One sentence originally included in *Flinn* seemed to contradict *Smith*, but the contradictory language in *Flinn* has since been deleted, thus leaving *Smith* as the controlling authority on this issue.