**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 24 1999**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

# UNITED STATES COURT OF APPEALS
# TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

SYLVESTER ANDERSON,

    Defendant-Appellant,

No. 97-3026

---

Appeal from the United States District Court
for the District of Kansas
(D.C. No. 95-CR-20086)

---

David J. Richman (F.J. "Rick" Dindinger, with him on the briefs), of Burns, Figa
& Will, P.C., Englewood, Colorado, for Defendant-Appellant.

Kim M. Berger, Assistant United States Attorney (Jackie N. Williams, United
States Attorney, with her on the brief), Kansas City, Kansas, for Plaintiff-
Appellee.

---

Before **SEYMOUR**, Chief Judge, **EBEL** and **KELLY**, Circuit Judges.

---

**SEYMOUR**, Chief Judge.

Sylvester Anderson was convicted of conspiracy to distribute and possession with intent to distribute cocaine under 21 U.S.C. § 841(a)(i), and money laundering under 18 U.S.C. § 1956(a)(1)(B)(i). He appeals his conviction and sentence. We affirm in part, reverse in part, and remand for resentencing.

**I**

Mr. Anderson was named in five counts of a sixteen-count indictment that charged numerous defendants with drug trafficking offenses. The charges arose from an alleged conspiracy to use couriers to transport cocaine and cocaine base from Los Angeles to the Kansas City area for sale, and to transport the proceeds from the sale of the drugs back to Los Angeles. Count One charged Mr. Anderson and fourteen other coconspirators including Robert White with conspiring to distribute the drugs, Count Seven charged Mr. Anderson with possessing ten kilograms of cocaine with intent to distribute, Count Eight charged him and two others with possessing seven kilograms of cocaine with intent to distribute, Count Ten charged him and Mr. White with possessing one kilogram of cocaine with intent to distribute, and Count Sixteen charged Mr. Anderson with money laundering.

All of those named in the indictment pled guilty except Mr. Anderson and Mr. White, who were tried together. The district court granted Mr. White's

motion for judgment of acquittal on the conspiracy count, and sent the remaining counts against Mr. Anderson and Mr. White to the jury. Mr. Anderson was convicted of conspiracy under Count One, possession of seven kilograms of cocaine with intent to distribute under Count Eight, and money laundering under Count Sixteen. The jury was unable to reach a verdict on either Count Seven, which charged Mr. Anderson with possessing ten kilograms of cocaine, or Count Ten, which charged him and Mr. White with possessing one kilogram.[1] A mistrial was declared as to those counts.

In sentencing Mr. Anderson, the district court enhanced his offense level two points based on his alleged leadership role in the offenses, and two points based on a finding that he had committed perjury or obstructed justice in the proceedings. The judge imposed concurrent sentences of 396 months on Counts One and Eight, and 240 months on Count Sixteen.

Mr. Anderson argues on appeal that (1) the evidence was insufficient to support his convictions; (2) the district court erred in refusing to allow his counsel to withdraw prior to trial; and (3) the court erred in enhancing his sentence based on his role in the offense and the commission of perjury.

---

[1] Mr. White was acquitted on Count Ten.

# II

## SUFFICIENCY OF THE EVIDENCE

### A.     Drug Crimes

Mr. Anderson contends the evidence was insufficient to support any of his convictions.  In addressing this claim, we view the evidence most favorably to the government to determine whether any rational jury could have found the elements of the crimes beyond a reasonable doubt.  *See United States v. Jones*, 44 F.3d 860, 864 (10th Cir. 1995).  "The jury, as fact finder, has discretion to resolve all conflicting testimony, weigh the evidence, and draw inferences from the basic facts to the ultimate facts."  *United States v. Valadez-Gallegos*, 162 F.3d 1256, 1262 (10th Cir. 1998).  "However, we may not uphold a conviction obtained by piling inference upon inference. . . .  The evidence supporting the conviction must be substantial and do more than raise a suspicion of guilt."  *Id.*  We begin our consideration by reviewing the trial evidence relevant to both the conspiracy and possession convictions because they are interrelated.  We address the money laundering conviction separately.

In Count One, the government charged that fourteen coconspirators, including Mr. Anderson, conspired with numerous unindicted coconspirators to distribute cocaine and cocaine base by recruiting couriers to travel from the

Kansas City area to Los Angeles, pick up large quantities of the drugs, and return primarily by bus to Kansas City. Mr. Anderson and others were charged with distributing the drugs. Couriers were also allegedly recruited to travel from Kansas City to Los Angeles to return the proceeds from the drug sales. The indictment charged that the conspiracy was organized and controlled by James Walton in Los Angeles, and that he was the source of the drugs brought back for sale in Kansas City.

Count One alleged numerous overt acts in furtherance of the conspiracy, several of which named Mr. Anderson. One overt act charged that Mr. Anderson picked up a courier, Dishire Davey, at the airport in Los Angeles after she had been recruited by other coconspirators to fly there and bring drugs back to Kansas City. This allegation also formed the basis of Mr. Anderson's conviction on Count Eight for aiding and abetting possession with intent to distribute seven kilograms of cocaine. Another overt act in furtherance of the conspiracy alleged that Mr. Anderson distributed a kilogram of cocaine to Mr. White on January 19, 1995. This allegation also formed the basis of the substantive charge in Count Ten that resulted in a mistrial.

We begin our assessment of the sufficiency of this evidence by acknowledging, as Mr. Anderson points out, that much of the evidence presented at trial in support of his role in the offenses was conflicting and subject to

impeachment. Juan Harkness, an unindicted coconspirator, testified that he took part in the conspiracy by delivering drugs to Mr. Anderson from Mr. Walton. Mr. Harkness stated that Mr. Walton would page him and instruct him on delivering the drugs to Mr. Anderson, that he took about two kilograms to Mr. Anderson every other week in Kansas, and that Mr. Anderson paid cash for them. Although this evidence supports the count charging that Mr. Anderson was a member of the conspiracy, its probative value was undercut by the fact that it also formed the basis for the substantive count of possessing ten kilograms with intent to distribute set out in Count Seven that resulted in a mistrial.

Mr. Harkness also testified about the incident set out as an overt act in furtherance of the conspiracy that formed the basis for Count Eight, the substantive count upon which Mr. Anderson was convicted, charging him and other coconspirators with possessing seven kilograms of cocaine with intent to distribute. Mr. Harkness testified that he was told by Mr. Walton to arrange for a courier to fly to Los Angeles. Mr. Harkness went to an apartment, met a woman named Dishire Davey, gave her a plane ticket, and took her to the airport. A few days later he received a page from Mr. Walton telling him to pick up Ms. Davey at the bus station in Topeka, Kansas. He and Mr. Walton arrived at the station but Ms. Davey never appeared. Mr. Harkness did not implicate Mr. Anderson in the incident involving Ms. Davey, however, testifying to the contrary that Mr.

Anderson was not at the apartment when he picked up Ms. Davey and took her to the airport, and that Mr. Anderson could not have met her at the Los Angeles airport because he and Mr. Anderson were together at a concert later that night in Kansas.[2]

However, Dishire Davey also testified about Mr. Anderson's involvement in the conduct underlying Count Eight. She stated that she was recruited by others to make a trip to California and bring back what she knew was an illegal substance. She further stated that Mr. Harkness took her to the airport in Kansas, and that Mr. Anderson was a passenger in the Lexus that picked her up at the Los Angeles airport. She remained in California about four days before an unidentified man picked her up at the hotel and took her to the bus station. The man gave her a ticket and a box, instructing her to say that the box contained a computer terminal if she were asked about its contents. She arrived in Topeka early in the morning and paged Mr. Harkness. Before she heard from him, she was questioned by DEA agents and decided to cooperate. The agents opened the box in her presence and discovered seven kilograms of cocaine. Ms. Davey was positive at trial in her identification of Mr. Anderson as the passenger in the car

---

[2] We note that the jury convicted Mr. Anderson on Count Eight notwithstanding Mr. Harkness' testimony exculpating him, while the jury was unable to reach a verdict on Count Seven, which was based upon Mr. Harkness' testimony implicating Mr. Anderson in the distribution of ten kilograms of cocaine. The jury apparently did not find Mr. Harkness to be a credible witness.

that met her in Los Angeles.

Lisa Gaitan, an unindicted coconspirator, testified about her role in the conspiracy in Kansas and provided the most persuasive evidence linking Mr. Anderson to it. She knew Mr. Anderson through Mr. Walton, who was her high school friend. She testified that she brought money to Mr. Walton in Las Vegas and visited him in Los Angeles. She made arrangements with Mr. Walton to visit him again in Los Angeles and agreed to bring a package with her. Mr. Walton arranged for Mr. Anderson to take her to the bus station and gave her Mr. Anderson's pager number. She testified that after Mr. Anderson picked her up, they stopped by someone's house on the way to the station and Mr. Anderson went inside. He came out with a gray box about the size of a tissue box wrapped in gray tape. When they arrived at the bus station, Mr. Anderson went in and bought the ticket while she waited in the car. She had packed one bag for the trip and Mr. Anderson gave her another one. She put half her clothes in the other bag along with the box. After buying the ticket, they left to get something to eat and were stopped by the police on the way back to the station. At that point Mr. Anderson told her to say that she was going to a city other than Los Angeles. After Mr. Anderson was arrested for outstanding traffic violations and taken to a police car, Ms. Gaitan gave the police permission to check the bags and they discovered the box, opened it and found $45, 000.

In addition to the coconspirator testimony detailed above, the government presented other evidence through various drug agents, police officers, and phone company personnel. For example, a search of the house in which Mr. Anderson's girlfriend lived uncovered items linking Mr. Anderson to the residence and a triple beam scale commonly used to weigh out drugs. A search of Mr. Anderson's residence revealed numerous items of expensive clothing, a set of pocket drug scales, digital drug scales, a safe containing over $50,000, a "street sweeper" shotgun and an assault rifle near the safe, and three semiautomatic handguns under the mattress in Mr. Anderson's bedroom. Government investigation of Mr. Anderson's financial situation showed that he had no legitimate source of income.

In addition, the government presented evidence showing that no local calls were made from Mr. Anderson's cell phone during a four-day period surrounding the date on which Dishire Davey landed in Los Angeles, and that the phone was used in California during that period. The hotel receipt for one of the rooms in which Ms. Davey stayed was in the name of an alias used by Mr. Walton, and the Lexus that picked up Ms. Davey belonged to Mr. Walton. Phone records also revealed that Mr. Anderson had made over 34,000 calls during the relevant period, 277 of which were made to Mr. Walton's pager.

"To support a conspiracy conviction, 'the government must show that there was an agreement to violate the law, that the defendant knew the essential

objectives of the conspiracy, that the defendant knowingly and voluntarily took part in the conspiracy, and that the conspirators were interdependent.'" *Jones*, 44 F.3d at 864-65 (citations omitted). "A defendant's connection to a conspiracy may be slight, but that slight connection must be proven with evidence to establish knowing participation beyond a reasonable doubt." *United States v. Slater*, 971 F.2d 626, 630 (10th Cir. 1992). The evidence set out above, viewed most favorably to the government, is sufficient to support the jury's finding that the charged conspiracy existed and that Mr. Anderson knowingly participated in it. Although Mr. Anderson presented contradictory evidence, evaluating the credibility of witnesses is a matter left to the finder of fact. Viewed most favorably to the conviction, the government's evidence, albeit disputed, was sufficient to sustain the jury's determination that Mr. Anderson participated in the conspiracy.

We likewise conclude the evidence was sufficient to support Mr. Anderson's conviction for aiding and abetting possession with intent to distribute the seven kilograms of cocaine seized from Dishire Davey.

> To be guilty of aiding and abetting the commission of a crime, the defendant must willfully associate himself with the criminal venture and seek to make the venture succeed through some action of his own. Participation in the criminal venture may be established by circumstantial evidence and the level of participation may be of "relatively slight moment."

*United States v. Leos-Quijada*, 107 F.3d 786, 794 (10th Cir. 1997) (citations

omitted). As one circuit has pointed out, determining whether the evidence is sufficient to support a conviction for aiding and abetting in a drug distribution case "'is difficult if not impossible.'" *United States v. Ledezma*, 26 F.3d 636, 641 (6th Cir. 1994) (quoting *United States v. Winston*, 687 F.2d 832, 834 (6th Cir. 1982)). Nonetheless, the evidence showed that Mr. Anderson participated in the conspiracy to distribute drugs, that he went to the airport to pick up a coconspirator drug courier in a car owned by the leader of the conspiracy, and that the courier was provided a hotel room registered in an alias used by that leader. This evidence, although not overwhelming and not undisputed, is sufficient to show that Mr. Anderson willfully associated with Ms. Davey's possession of seven kilograms of cocaine with intent to distribute and participated in some manner to assist its commission.[3]

---

[3] Our affirmance of Mr. Anderson's drug conspiracy conviction distinguishes this case from those aiding and abetting cases in which the defendant was not a member of a conspiracy. In those cases we have held that a defendant's mere presence at the scene of a crime, even with knowledge that the crime is being committed, is insufficient to support an aiding and abetting conviction. *See, e.g., United States v. Verners*, 53 F.3d 291, 295 (10th Cir. 1995) (quoting *United States v. Esparsen*, 930 F.2d 1461, 1470 (10th Cir. 1991)). When the alleged aider and abetter is a member of a conspiracy and the substantive crime is done in furtherance of the conspiracy, however, criminal liability is governed by different principles. We have held that a criminal conspirator is criminally responsible for substantive crimes committed by other conspirators during the course of and in furtherance of the conspiracy that are reasonably foreseeable. *See United States v. Willis*, 102 F.3d 1078, 1083-84 & n.3 (10th Cir. 1996); *United States v. Self*, 2 F.3d 1071, 1088-89 (10th Cir. 1993). The jury was

(continued...)

**B.    Money Laundering**

Mr. Anderson was also convicted on Count Sixteen, which charged that his purchase of a 1991 Pontiac Firebird with drug proceeds constituted a violation of the federal money laundering statute, 18 U.S.C. § 1956(a)(1)(B)(i).  Mr. Anderson asserts two challenges to this conviction, arguing that the evidence was insufficient and that the district court erred in allowing the jury to hear evidence of other financial transactions without a limiting instruction, thus creating the possibility that he was convicted on the basis of events not charged in the indictment.

The portion of the money laundering statute under which Mr Anderson was charged penalizes

> [w]hoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . knowing that the transaction is designed in whole or in part . . .to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

18 U.S.C. § 1956(a)(1)(B)(i).

---

[3](...continued)
instructed to that effect in the present case.  *See* Rec., vol. 9, at 55.  We thus reject Mr. Anderson's claim that plain error occurred because the jury was not instructed that mere presence at the crime scene is not enough to support an aiding and abetting conviction.

The money laundering count here alleged that Mr. Anderson committed the crime by buying a Pontiac Firebird with drug proceeds and titling the car in his mother's name to conceal the source of the purchase money. At trial, the government presented evidence from an automobile sales representative that Mr. Anderson had purchased two vehicles from her before negotiating the purchase of the Firebird. In the previous transactions, Mr. Anderson bought the vehicles personally and titled them in his name. Prior to purchasing the Firebird, Mr. Anderson personally negotiated with the same sales person for several days before the transaction was completed in cash. The purchase agreement for the vehicle, a copy of which was kept at the dealership, contained information provided by Mr. Anderson, including his address, and phone number. Although the agreement originally showed Mr. Anderson as the purchaser, he had the name of the purchaser changed to that of his mother, Teresa Anderson. Mr. Anderson's mother came in to sign the transfer of title, and the sales person met her when she did so. Mrs. Anderson subsequently bought a vehicle from the sales person for herself a short time later. On appeal, Mr. Anderson argues that this evidence is insufficient to show that the transaction was designed to conceal proceeds from illegal activities as required by the statute. We agree.

In assessing the sufficiency of the evidence to support a money laundering conviction, this court has cautioned against interpreting the statute so broadly as

to "turn the money laundering statute into a 'money spending statute.'" *United States v. Sanders*, 928 F.2d 940, 946 (10th Cir. 1991). We have recognized the difficulty "of separating money laundering, which is punishable by up to twenty years in prison, from mere money spending, which is legal." *United States v. Garcia-Emanuel*, 14 F.3d 1469, 1474 (10th Cir. 1994).

> Whenever a drug dealer uses his profits to acquire any asset--whether a house, a car, a horse, or a television--a jury could reasonably suspect that on some level he is motivated by a desire to convert his cash into a more legitimate form. The requirement that the transaction be "designed" to conceal, however, requires more than a trivial motivation to conceal.

*Id.* Accordingly, we stated that "[i]n these cases, our requirement that the jury verdicts of guilt beyond a reasonable doubt be based on substantial evidence, and not mere suspicion, becomes paramount." *Id.* at 1475 (citation omitted).

> While there are many things that criminals can do with their profits that would arouse suspicion of an intent to launder the money, actions that are merely suspicious and do not provide substantial evidence of a design to conceal will not alone support a conviction. There are many examples of suspicious behavior that we have held will not, standing alone, justify a finding of a design to conceal beyond a reasonable doubt. We held in *Sanders* that the defendant's decision to register a car in his daughter's name would not alone support his conviction. Likewise in [*United States v. Lovett*, 964 F.2d 1029, 1036 (10th Cir. 1992)], we reversed a conviction based on similar circumstances--the purchase of a vehicle registered in a family member's name with proceeds of an illegal transaction.
> . . . .
> . . . [E]ven the additional evidence of the use of a large amount of cash to purchase a car was not sufficient to satisfy the proof necessary to sustain a money laundering conviction.

*Id.* (citing *Sanders*, 928 F.2d at 945-56).

We observed in *Sanders* that "the purpose of the money laundering statute is to reach commercial transactions intended (at least in part) to disguise the relationship of the item purchased with the person providing the proceeds and that the proceeds used to make the purchase were obtained from illegal activities." 928 F.2d at 946. And in *Garcia-Emmanuel*, we listed various types of evidence relied on in money laundering cases to establish an intent to disguise or conceal a transaction:

> They include, among others, statements by a defendant probative of intent to conceal; unusual secrecy surrounding the transaction; structuring the transaction in a way to avoid attention; depositing illegal profits in the bank account of a legitimate business; highly irregular features of the transaction; using third parties to conceal the real owner; a series of unusual financial moves cumulating in the transaction; or expert testimony on practices of criminals.

14 F.3d at 1475-76 (citations omitted).

We see no material facts in the instant case that distinguish it from the circumstances held insufficient in *Sanders* to support money laundering. Here, as in that case, the vehicle was purchased with cash and placed in the name of a family member, facts that we have explicitly held are not adequate to support a money laundering conviction. Mr. Anderson made no attempt to conceal his role in the transaction, nor did he caution the sales person not to talk about it. As our cases make clear, a money laundering conviction must be reversed when it is

"supported only by the evidence that ownership of a vehicle was placed in the name of a relative and that the defendant used a large amount of cash. . . . [M]ere accumulation of non-concealing behavior is not enough to sustain a conviction for money laundering." *Id.* at 1476. Accordingly, we reverse Mr. Anderson's conviction on Count Sixteen charging him with money laundering.

## III

### FAILURE TO APPOINT SUBSTITUTE COUNSEL

Prior to trial, both Mr. Anderson and his counsel filed motions to have substitute counsel appointed. The district court held a hearing on the motions and denied them. On appeal, Mr. Anderson argues that the court abused its discretion in refusing to allow counsel to withdraw, and asks that he be given a new trial.

Mr. Anderson's trial was originally set to begin on July 24, 1996, and actually began on July 30. On June 21, Mr. Anderson's counsel filed a motion to withdraw, stating in support of the motion that "the attorney/client relationship has so irretrievably broken down that counsel will be unable to effectively cooperate with and defend their client." Rec., supp. vol. 1, doc. 482. Counsel also indicated that Mr. Anderson wanted new counsel. On July 11, Mr. Anderson filed a pro se motion styled "Motion for Ineffective Assistance in Counsel" in which he asserted that his counsel's performance was deficient, resulting in

prejudice to his defense. *Id.* at doc. 524. He requested either that the court appoint new counsel or that he be allowed to proceed pro se.

The district court held a hearing on the matter on June 28. Both of Mr. Anderson's attorneys indicated their belief that their ability to work with Mr. Anderson had been compromised because he had lost confidence in them. The court also heard from Mr. Anderson in camera. Mr. Anderson stated that he and his attorney had not been on the best of terms, and that he did not feel their representation of him had been appropriate. He stated that they did not agree with his requests to file motions and that they wanted to do things their way. He also stated that his counsel had expressed to others a belief that Mr. Anderson's prospects did not look hopeful based on the evidence against him. Although the court questioned Mr. Anderson closely, Mr. Anderson did not provide information indicating that counsel had revealed privileged information, and the court concluded that the attorneys had merely expressed their belief that Mr. Anderson's chances of winning were not very good.

The court fully discussed the situation in camera with Mr. Anderson and then denied the motions. In so doing, the court stated that it did not find a factual showing of a complete breakdown in communication or other irreconcilable conflict, but rather a communication problem that he believed could be mended. The court also stated its belief that it would be virtually impossible for another

lawyer to come into the case at that point in time and be prepared to try it.[4]

We review a district court's denial of a motion to appoint substitute counsel for an abuse of discretion. *See United States v. Johnson*, 961 F.2d 1488, 1490 (10th Cir. 1992). Substitution-of-counsel standards are imposed by the Sixth Amendment and

> require that "[t]o warrant a substitution of counsel, the defendant must show good cause, such as a conflict of interest, a complete breakdown of communication or an irreconcilable conflict which leads to an apparently unjust verdict." The district court is under a duty to "make formal inquiry into the defendant's reasons for dissatisfaction with present counsel when substitution of counsel is requested."

*Johnson v. Gibson*, 169 F.3d 1239, 1254 (10th Cir. 1999) (citation omitted).

The district court here carefully complied with its duty to inquire into Mr. Anderson's reasons for requesting substitute counsel. We cannot say that the court abused its discretion in concluding that, after discussing the matter with Mr. Anderson in camera, the relationship between Mr. Anderson and his attorneys would improve. The court stated its belief to Mr. Anderson that, based on the court's experience, trial counsel was highly competent and effective and would represent him as well as anyone could. *See United States v. Reddeck*, 22 F.3d

---

[4] At that time it appeared that ten defendants would be going to trial on July 24, and the date for filing motions in limine was July 16. By the time of trial on July 30, however, all defendants but Mr. Anderson and Mr. White had entered pleas.

-18-

1504, 1511 (10th Cir. 1994).  Moreover, good cause for substitution of counsel is not shown by the fact that counsel refused to structure a defense as defendant wanted.  *See United States v. Padilla*, 819 F.2d 952, 956 (10th Cir. 1987). Finally, the court's belief that newly appointed counsel could not step into a complex drug conspiracy case and be ready for trial by the date set is a legitimate concern that, coupled with the above circumstances, convinces us the court did not abuse its discretion in denying the appointment of substitute counsel here.

## IV

## SENTENCING ENHANCEMENTS

In sentencing Mr. Anderson, the district court imposed a two-level increase in the base offense level under U.S.S.G. § 3B1.1(c) for Mr. Anderson's role in the offense, and a two-level increase under section 3C1.1 for obstruction of justice. Mr. Anderson argues on appeal that neither enhancement was supported by the evidence or by appropriate findings.

**A.    Role in the Offense**

Section 3B1.1(c) provides that a defendant's offense level is to be increased two levels "[i]f the defendant was an organizer, leader, manager, or

supervisor in any criminal activity."[5]  The government bears the burden of

proving by a preponderance of the evidence the facts necessary to establish the

applicability of this enhancement.  *See United States v. Cruz Camacho*, 137 F.3d

1220, 1224 (10th Cir. 1998).

> In determining whether the defendant's sentence should be raised,
> the court should consider "the exercise of decision making authority,
> the nature of participation in the commission of the offense, the
> recruitment of accomplices, the claimed right to a larger share of the
> fruits of the crime, the degree of participation in planning or
> organizing the offense . . . and the degree of control and authority
> exercised over others."

*United States v. Baez-Acuna*, 54 F.3d 634, 638-39 (10th Cir. 1995) (quoting

U.S.S.G. § 3B1.1, comment. (n.4) (1992)).  "In considering these factors, the

sentencing court should remain conscious of the fact that the gravamen of this

enhancement is control, organization, and responsibility for the actions of other

individuals because § 3B1.1(a) is an enhancement for organizers or leaders, not

for important or essential figures."  *United States v. Torres*, 53 F.3d 1129, 1142

(10th Cir. 1995) (citations omitted) (quotations omitted).  We review the district

court's decision to apply the enhancement under the clearly erroneous standard.

---

[5] The guideline also provides for a four-level enhancement if the defendant
was a leader or organizer of a criminal activity that involved five or more
participants or was otherwise extensive, *see* U.S.S.G. § 3B1.1(a), and a three-
level enhancement if the defendant was a manager or supervisor (but not a leader
or organizer) and the criminal activity involved five or more participants or was
otherwise extensive, *see id.* § 3B1.1(b).

*See Cruz Camacho*, 137 F.3d at 1223-24.

> In ruling that the enhancement was applicable here, the district court stated:
>
> I'm persuaded by a preponderance of the evidence that Mr. Anderson did have a management and supervisory role in the way in which the cocaine was brought to Kansas and then broken down for further distribution and the way in which the proceeds went back to Los Angeles. He coordinated the receipt of the cocaine itself and he coordinated the way in which certain carriers took it back to Los Angeles.

Rec., vol. 5, at 59.[6] As the court observed at trial at the close of the government's case, however:

> [T]here really wasn't even any evidence here that described how the drugs were distributed on the street. This is not a case in which we've had a description of the conspiracy which paints various roles . . . .
>     There was no evidence of how the drugs were distributed beyond being brought back in quantity to Kansas City. . . .[T]here's nothing beyond the fact that bulk drugs were brought back to Kansas City in--in large quantities.

Rec., vol. 3, at 83-84. Our review of the record convinces us the evidence does

not support the district court's finding that Mr. Anderson was a manager or

---

[6] The district court also stated its agreement with the analysis set out in the presentence report, which stated:
> The defendant was a manager/distributor for this organization. The defendant would coordinate shipments of cocaine with Walton and there was some testimony Anderson then would cook it into crack for distribution on the streets of Kansas City. The defendant would then send proceeds back to Walton in Los Angeles in order to have an additional amount of cocaine shipped to him.

Rec., vol. 12, at 13. As we discuss *infra,* distribution of drugs as a middleman and cooking cocaine into crack do not support enhancement under this guideline.

supervisor in this drug conspiracy.

Juan Harkness testified that he sold drugs to Mr. Anderson when Mr. Walton told him to. But the government presented no evidence showing what happened to the drugs thereafter and offered no evidence of drug records kept by Mr. Anderson. Mr. Anderson's role as a supplier of drugs to others, standing alone, is not enough to establish his role as a leader or organizer. *See United States v. Owens*, 70 F.3d 1118, 1129, (10th Cir. 1995). The record contains no evidence that other sellers worked for Mr. Anderson, that he paid others for their efforts on behalf of the conspiracy, that he restricted the people to whom other coconspirators could sell their drugs, that he controlled the manner of sales, set prices, or claimed the right to a larger share of the proceeds. *See id.* (lack of above evidence renders sentencing court's application of the guideline clearly erroneous); *see also Torres*, 53 F.3d at 1143 (same). Other than Mr. Walton's admitted role as the head of the conspiracy, the only evidence describing the leadership and/or supervisory roles of others in the offense was the testimony of Mr. Walton's cousin, Anthony Davis, who agreed that Mr. Harkness was going to direct the distribution of the drugs brought back by Ms. Davey and that Mr. Harkness was "the one running the show." Rec., vol. 13, at 119.

While the record does show Mr. Anderson's involvement with coconspirators who carried money and drugs, there is no evidence showing that he

recruited them or controlled their activity.[7]  Likewise, although the record establishes Mr. Anderson's possession of large sums of money, the government did not show how the profits of the conspiracy were divided, or that Mr. Anderson claimed or received a larger share of the profits than others.  Absent such a showing, the mere fact that Mr. Anderson received profits does not support the enhancement.  *See United States v. Albers*, 93 F.3d 1469, 1489 (10th Cir. 1996).  Finally, the fact that Mr. Anderson cooked cocaine powder into base does not show that he organized or led the conspiracy or supervised others.  *See Owens*, 70 F.3d at 1129.

In sum, the evidence of Mr. Anderson's involvement in the conspiracy is not sufficient, under our cases, to support application of the enhancement for his role in the offense. Accordingly, we conclude that the district court erred in enhancing his sentence on that basis.

---

[7] Ms. Gaitan did testify that Mr. Anderson told her to lie about her destination when they were stopped on the way to the bus station.  We are not persuaded that this single remark, made in response to the exigencies of the moment, is sufficient to establish that Mr. Anderson controlled or supervised Ms. Gaitan in her courier activities.  The evidence likewise does not establish that the decision to provide Ms. Gaitan with the box of money and the extra suitcase originated with Mr. Anderson rather than with Mr. Walton, who had arranged for Mr. Anderson to take Ms. Gaitan to the station.  *See United States v. Albers*, 93 F.3d 1469, 1488 (10th Cir. 1996).  While we have concluded that the evidence of Mr. Anderson's involvement with Ms. Davey is sufficient to support his conviction for aiding and abetting, we have found nothing in the record to show that he supervised or controlled her activity.

**B.      Obstruction of Justice**

Section 3C1.1 requires a two-point upward adjustment to a defendant's offense level "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense."[8] "Obstruction of justice includes the offering of perjured testimony at trial." *United States v. Copus*, 110 F.3d 1529, 1536 (10th Cir. 1997). "A defendant commits perjury for the purposes of this Guideline if he 'gives false testimony concerning a material matter with the willful intent to provide false testimony.'" *United States v. Pretty*, 98 F.3d 1213, 1221 (10th Cir. 1996).

> The mere fact that a defendant testifies to his or her innocence and is later found guilty by the jury does not automatically warrant a finding of perjury. An automatic finding of untruthfulness, based on the verdict alone, would impinge upon the constitutional right to testify on one's own behalf.

*United States v. Markum*, 4 F.3d 891, 897 (10th Cir. 1993) (citations omitted). Therefore, "[i]n order to apply the § 3C1.1 enhancement, it is well-settled that a sentencing court must make a specific finding--that is, one which is independent of the jury verdict--that the defendant has perjured herself." *United States v.*

---

[8] We have set out the guideline in effect on the date of sentencing, January 23, 1997. Section 3C1.1 was amended effective November 1, 1997. *See* App. C, amendment 566 (Nov. 1, 1997).

*Massey*, 48 F.3d 1560, 1573 (10th Cir. 1995). The required finding must encompass "'all of the factual predicates of perjury,'" *id.* (quoting *United States v. Dunnigan*, 507 U.S. 87, 95 (1993)), so that we are able "'to satisfy our appellate responsibility of review in determining whether the record would support findings of falsity, materiality, and willful intent.'" *Owens*, 70 F.3d at 1132 (quoting *Massey*, 48 F.3d at 1574).

In applying the enhancement here, the district court cited three instances in which it believed Mr. Anderson committed perjury. First the court viewed as false Mr. Anderson's contradiction of the testimony of Dishire Davey. Second, the court stated its belief that Mr. Anderson "was not telling the truth concerning the purchase of the cocaine from Mr. Walton and that he wasn't even very close to him." Rec., vol. 5, at 67. Third, the court found that Mr. Anderson committed perjury by testifying that the money in his possession was stolen from Mr. Harkness rather than constituting proceeds from Mr. Anderson's drug activities.

On appeal, Mr. Anderson argues that the court's findings are inadequate, pointing out that much of the testimony concerning his involvement with Ms. Davey and Mr. Walton was conflicting, that the court did not explain its reconciliation of the conflicts, and that the court did not make findings on all the elements of perjury. Mr. Anderson also contends the court erroneously attributed to him a statement actually made by Mr. Walton. It was Mr. Walton, not Mr.

Anderson, who testified regarding their relationship that "[w]e wasn't real close or nothing, just knew of him, but we never really hung out."  Rec., supp. vol. 3, at 46.

Our review of the record persuades us the district court satisfied the requirements for application of an obstruction of justice enhancement in two of the three occasions of perjury it referred to.  First, the court specifically found that Mr. Anderson lied under oath in contradicting the testimony of Dishire Davey.

> I believe that he lied intentionally about that contact with Dishire Davey in order to influence the jury to find him not guilty.  I am persuaded that she told the truth, based upon my scrutiny of her credibility, the means and manner of her testifying, her demeanor.
> I believe she was telling the truth by the converse, by observing the demeanor of Mr. Anderson, as well as the words from his mouth and the other circumstances which corroborate or not corroborate testimony, I'm persuaded Mr. Anderson was not telling the truth.

*See* Rec., vol. 5, at 66-67.  In this factual finding, the district court set out the reasons why it believed Mr. Anderson's denial of having met Ms. Davey in California was false, and why the falsehood was intentional.  Moreover, it is clear that the falsehood was material, as Mr. Anderson's contact with Ms. Davey was an overt act underlying the conspiracy charge in Count One, and was the basis of the aiding and abetting charge in Count Eight.

Second, the district court found that Mr. Anderson "specifically testified

-26-

with the intent to cause the jury not to find him guilty" when he claimed that a large amount of cash in his possession "was money that he had stolen from Juan Harkness as opposed to drug proceeds." Rec., vol. 5, at 67. The court elaborated:

> I believe Mr. Anderson was lying, I believe his demeanor at that particular point in time was highly incredible supporting the notion that he was lying. I think truly what happened is he should have taken [counsel's] advice to not testify. He found himself on the stand, he found himself cross-examined by something he had no way to explain and he did what came naturally to him, he made something up, that this was stolen from Juan Harkness instead of something that was the product of drug proceeds. He lied.

Rec., vol. 5 at 67-68. This finding of perjury is also sufficient. The district court pointed to specific testimony it believed was intentionally false, and the court supported its finding with its observation of Mr. Anderson's demeanor. Furthermore, the testimony was material, as the possession of large amounts of cash would be probative of Mr. Anderson's involvement with the illegal drug trade. *See* Rec., vol. 3, at 163-65.

We have trouble, however, with the third basis for the district court's obstruction of justice enhancement. The court found that Mr. Anderson "was not telling the truth concerning the purchase of cocaine from Mr. Walton and that he wasn't even very close to him." Rec., vol. 5, at 67. As Mr. Anderson points out, the district court erroneously attributed to him the statement made by Mr. Walton that the two were not close. Additionally, it is not clear to which of Mr. Anderson's statements the court was referring in finding that he was untruthful

about purchasing cocaine from Mr. Walton. Although Mr. Anderson denied being involved in a conspiracy with Mr. Walton to distribute cocaine, *see* Rec., vol. 3, at 104, we could find no direct statements in Mr. Anderson's testimony regarding a purchase of cocaine from Mr. Walton.

Although one of the grounds on which the district court found perjury is not substantiated by the record, the other two findings of perjury fully support an obstruction of justice enhancement. Because we are convinced the district court would have imposed the same sentence enhancement based on the two findings of perjury, the error is harmless. *See Williams v. United States*, 503 U.S. 193, 203 (1992).

## V

In sum, we **AFFIRM** Mr. Anderson's convictions for conspiracy and for aiding and abetting the possession of cocaine with intent to distribute. We hold the evidence is insufficient to support his conviction for money laundering and we therefore **REVERSE** his conviction on that charge. We further hold the evidence is insufficient to support an enhancement for Mr. Anderson's role in the offense and we **REVERSE** the enhancement of his sentence on that basis. We **REMAND** for resentencing in light of this opinion.