FILED
United States Court of Appeals
Tenth Circuit

September 6, 2007

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plainitff - Appellee,

v.

BOBBY WAYNE HALEY,

Defendant - Appellant.

No. 06-5037

D.C. No. 04-CR-127-001-TCK

(N.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **HENRY**, **BRISCOE**, and **O'BRIEN**, Circuit Judges.

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Bobby Haley, Sr., was convicted by a jury of several drug offenses. He was sentenced to 264 months imprisonment. He challenges the legality of the

_____

[*]This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

search of the premises where drugs were found and his sentence. We affirm.

## I. Factual Background

A. <u>July 2003 Conspiracy</u>

In July 2003, Officer Carlos Guzman, acting undercover, met with Adrian Tobie to discuss purchasing a one-half kilogram of crack cocaine. Tobie sought $12,500 for the crack cocaine; Guzman stated he could only afford $8,000. Tobie informed Guzman he could not lower the price without his source's authorization. He said he would consult his source and try to obtain a lower price. Tobie and Guzman also discussed where the deal would take place. Tobie suggested a salvage yard owned by his source. Guzman refused to perform the transaction at the salvage yard and recommended the exchange take place at a neutral location. After meeting with Guzman, Tobie went to see his source, Haley, at the salvage yard to discuss the deal. Later, Tobie informed Guzman he had talked to his source and the price could not be lowered. Guzman agreed to purchase the crack cocaine for $12,500.

The next morning, Tobie called Guzman and stated he was ready to conduct the deal at the salvage yard. Guzman refused to perform the transaction at the salvage yard and suggested he and Tobie meet again to discuss the deal's terms. Later that same day, Tobie and Guzman met in a store parking lot. There, Guzman reiterated he would not conduct the deal at the salvage yard. Guzman also showed Tobie the cash to be used to purchase the drugs. Tobie told Guzman

he would call him if he and his source would agree to a location other than the salvage yard.

Tobie immediately went to see Haley at the salvage yard and informed him the buyer had the money. Later that day, Haley told Tobie he was "ready" and to meet him at his North Rockford residence. (R. Vol. XIII at 235.) When Tobie arrived at the house, Haley was in the process of scraping crack cocaine from a Pyrex bowl. He then bagged the crack cocaine and placed it in a container. Because he did not trust Tobie with such a large amount of drugs, Haley called his brother, Ronald, and a friend, Michael, to follow Tobie with the drugs. Tobie called Guzman and told him he and his source had agreed to perform the deal at a neutral location. Guzman told Tobie to meet him in the store parking lot. Officers in unmarked vehicles set up surveillance near the lot.

Tobie went to the store parking lot, with Ronald and Michael following in a black pickup truck. Tobie stopped behind the store and retrieved the drugs from Ronald. Tobie then drove to the parking lot; a few seconds later, Ronald and Michael arrived. Ronald and Michael backed their truck into a parking spot on the north side of the lot where they could observe Tobie. Concerned by the truck's presence and fearing a possible robbery, the surveillance officers created a ruse to determine if the truck was linked to Tobie. They had officers in marked patrol vehicles perform a traffic stop on surveillance officer Chris Claramunt's unmarked vehicle, a 1995 white Coupe DeVille Cadillac, at a location where

Tobie, Ronald and Michael would see it. They then had Guzman call Tobie and suggest they conduct the deal at a different location due to police being in the area. Tobie agreed and walked over to Ronald and Michael to inform them of the change in location.

Tobie then left the parking lot with Ronald and Michael following. A marked police car pulled behind Tobie's vehicle. Tobie accelerated and made an evasive turn before coming to a stop and unsuccessfully attempting to flee on foot. Once Tobie was secured, the officers searched his vehicle, discovering the container with the crack cocaine. Later testing revealed the crack cocaine weighed 501.7 grams. Another marked patrol unit followed and attempted to stop Ronald and Michael's vehicle. Ronald and Michael did not stop immediately but rather proceeded down the street and ran a red light before pulling over. In Michael's wallet, officers discovered a piece of paper with "white Cadillac" and the license plate number of Officer Claramunt's undercover vehicle on it. (R. Vol. XII at 167.)

B. May 2004 Search

In May 2004, a confidential informant informed Officer Jeff Henderson that he/she had recently observed Haley selling cocaine out of his salvage yard and the North Rockford residence. Henderson conducted nighttime surveillance of both locations. At the salvage yard, he observed pedestrians and vehicles enter the yard, stay for a few minutes and then leave; at the North Rockford residence, he

observed short-term pedestrian foot-traffic. Based on his training and experience, Henderson considered this activity to be consistent with drug activity. Henderson sought and obtained search warrants for the salvage yard and the North Rockford residence.

Officers executed the warrants. The salvage yard consisted of a house and garage. Inside the house, Haley was standing in the kitchen. After securing him, the officers searched the house. In the kitchen area, they discovered, *inter alia*, (1) powder and crack cocaine, (2) a Pyrex dish containing freshly cooked crack cocaine, (3) a razor blade with cocaine residue, (4) two boxes of baking soda on top of a microwave oven, (5) digital scales and (6) numerous sandwich baggies.[1] Officer Bill Yelton searched Haley's pockets, finding $1,500 in cash, a baggie containing a small amount of crack cocaine and bills/receipts for the salvage yard and North Rockford residence. At the North Rockford residence, officers seized crack cocaine, a .41 caliber derringer firearm in a display box, counterfeit money, and a set of digital scales.

## II. Procedural Background

Haley was originally indicted for (1) possession with intent to distribute fifty grams or more of crack cocaine and (2) possession with intent to distribute cocaine. These charges arose out of the execution of the search warrants at the

---

[1] At trial, Officers James Comstock and Chris Claramunt testified drugs are often distributed in sandwich baggies and crack cocaine is made by heating powder cocaine with baking soda and water.

salvage yard and North Rockford residence. Haley's first trial resulted in a hung jury. Subsequently, the government filed a superseding indictment. In addition to re-charging the two counts in the original indictment, the superseding indictment charged Haley with conspiracy to possess with intent to distribute fifty grams or more of crack cocaine. The conspiracy charge arose out of Haley's activities with Tobie in July 2003.[2] Haley again proceeded to trial. Haley denied being involved in the July 2003 incident.[3] As to the May 2004 events, he and his witnesses suggested the police planted the evidence discovered in his pockets and in the salvage yard's house.[4] The jury found Haley guilty of all three counts.

A presentence investigation report (PSR) was prepared.[5] Based on the

---

[2] The superseding indictment also named Tobie as a co-defendant and charged him with conspiracy to possess with intent to distribute fifty grams or more of crack cocaine and possession with intent to distribute fifty grams or more of crack cocaine. He pled guilty to the conspiracy charge.

[3] Additionally, Ronald and Michael testified they did not know Tobie. They stated they met Tobie for the first time on July 18, 2003, when Tobie hired them to move furniture. When they followed Tobie in their truck, they believed they were following him to the furniture's location. Michael also denied writing down Officer Claramunt's license plate number.

[4] Haley expressly accused the police of planting the baggie of crack cocaine found in his pocket. While he denied accusing the police of planting the contraband found in the house, he did testify it was not present when he arrived at the house. Individuals at the salvage yard at the time of its search testified they saw officers search Haley's pockets a number of times, each time returning the items to his pockets. At least one individual also observed an officer enter the salvage yard's house with a bag.

[5] Haley was sentenced pursuant to the 2004 edition of the United States Sentencing Commission Guidelines Manual. All citations to the guidelines in this

offense involving 53,156.7 kilograms of marijuana equivalent, the probation department determined Haley's base offense level was 38. With a criminal history category of II, it calculated the guideline range as 262-327 months imprisonment. Both Haley and the government filed objections to the PSR. Haley objected to the probation department's drug quantity calculation, in particular, its inclusion of two kilograms of crack cocaine which Tobie told officers after his arrest was the total amount of drugs he received from Haley in the two years preceding the July 2003 incident. The government argued the base offense level should be adjusted upward two levels under USSG §3B1.1(c) based on Haley's role as a leader, organizer or manager in the conspiracy.

The district court sustained both objections. As a result of the reduced drug quantity, Haley's base offense level was 36. Applying the two-level role in the offense adjustment, the total offense level was 38, resulting in a guideline range of 262-327 months imprisonment. The court sentenced Haley to 264 months imprisonment.

### III. Discussion

Haley challenges the lawfulness of the search of the salvage yard's house and his sentence.

A. Search of House

Haley argues the search of the salvage yard's house was invalid because the

opinion refer to the 2004 guidelines unless otherwise indicated.

search warrant for the salvage yard did not authorize the house's search. Although Haley raised a number of pre-trial motions in the district court, he did not (as he concedes on appeal) file a motion to suppress or otherwise challenge the search of the house. Thus, he has waived the issue and we decline review. Fed. R. Crim. P. 12(b)(3)(C), (e); *see also United States v. Brooks*, 438 F.3d 1231, 1240 (10th Cir. 2006) ("When a motion to suppress evidence is raised for the first time on appeal, we must decline review.").

B. Sentence

Haley claims the district court erred in applying the two-level upward adjustment for being a leader or organizer under USSG §3B1.1(c). He also contends his sentence is unreasonable under the factors set forth in 18 U.S.C. § 3553(a).

We review sentences imposed post-*Booker*[6] for reasonableness. *United States v. Kristl*, 437 F.3d 1050, 1053 (10th Cir. 2006). If the district court has correctly determined the guideline range and the defendant is sentenced within that range, the sentence is entitled to a "rebuttable presumption of reasonableness." *Id.* at 1054; *see also Rita v. United States*, --U.S.--, 127 S.Ct. 2456, 2462 (2007) (approving appellate court application of presumption of reasonableness to properly calculated within-guidelines sentences) . "The defendant may rebut this presumption by demonstrating that the sentence is

---

[6] *See United States v. Booker*, 543 U.S. 220 (2005).

unreasonable in light of the other sentencing factors laid out in § 3553(a)."

*Kristl,* 437 F.3d at 1055. In determining whether the district court correctly applied the guidelines, we review factual findings for clear error and legal determinations *de novo. Id.* at 1054.

### 1. *Leader/Organizer Adjustment (USSG §3B1.1(c))*

Haley claims the district court did not make adequate findings to support the USSG §3B1.1(c) adjustment and the facts do not support its application. Specifically, Haley maintains the mere fact he converted powder cocaine into crack cocaine, fronted the drugs to Tobie and set the price for the drugs is insufficient to show he was a leader or organizer of a conspiracy, especially since the conspiracy lasted only two days. He relies on *United States v. Anderson*, 189 F.3d 1201 (10th Cir. 1999).

Section 3B1.1(c) of the sentencing guidelines states: "If the defendant was an organizer, leader, manager, or supervisor in any criminal activity [involving less than five participants], increase by 2 levels." "In order to be a supervisor, one needs merely to give some form of direction or supervision to someone subordinate in the criminal activity[.]" *United States v. Mandilakis*, 23 F.3d 278, 280 (10th Cir. 1994) (quotations omitted). "Among the factors which a court may consider are the defendant's exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of

participation in planning or organizing the offense, the nature and scope of the illegal activity and the degree of control and authority exercised over others." *Id.* (quotations omitted).

In deciding to apply the USSG §3B1.1(c) adjustment, the district court stated:

> We've had evidence that [Haley] was a major supplier of drugs. This is a large amount of drugs. Over 500 grams in this one particular transaction. That he did set the price, according to the testimony that we've received, that the drugs were his. That Mr. Tobie went to his house off North Rockford and there was, as I recall, there was some surveillance at that time and some surveillance of Mr. Tobie going to the salvage yard, and there was certainly surveillance that indicated [Ronald and Michael] were involved. So this is not just Mr. Tobie's testimony. There's other circumstantial evidence and other direct evidence that supports that.
>
> The testimony was that [Haley] cooked the cocaine. Mr. Tobie says when he arrived, that [Haley] was in the process of bagging it and preparing it for this sale. That [Ronald and Michael] arrived and that they were directed, so they were under the control of [Haley], that [Ronald and Michael] were directed to take the drugs to this location. So they were given the direct control of those drugs for a period of time. They were there for surveillance and protection and get the money and return it to [Haley].
>
> Testimony is . . . that the money was to go directly back to [Haley]. I
> think that that is sufficient, more than sufficient, to indicate that this two-level enhancement should apply.
>
> The drugs were fronted, they were cooked, they were priced, all by [Haley], and there were other people in the organization that were directed by the defendant to take control of the drugs and to monitor the transaction, and there's a large amount of drugs that were involved . . . . The two-level enhancement based on leader, organizer will be applied.

(R. Vol. XVII at 30-32.)

These findings are sufficient to support the application of USSG §3B1.1(c) to Haley's sentence because they clearly show he supervised others (Tobie, Ronald and Michael) in the criminal activity.

*Anderson* is distinguishable. There, the evidence demonstrated Anderson bought drugs from the source, was involved with co-conspirators who carried money and drugs, and cooked cocaine into powder cocaine. 189 F.3d at 1212. We concluded such evidence was insufficient to support the application of USSG §3B1.1 to Anderson's sentence. *Id*. However, there was no evidence showing (1) what happened to the drugs Anderson bought from the source, (2) Anderson recruited or controlled the activity of the conspirators he was involved with, (3) Anderson paid others for their services to the conspiracy, (4) Anderson set the drug price or controlled the manner of the drug sales or (5) Anderson claimed the right to receive a larger share of the proceeds. *Id*. Therefore, unlike in this case, there was no evidence Anderson supervised or gave directions to any subordinates. Indeed, in *Anderson*, the evidence pointed to two other individuals as "running the show." *Id*. (quotations omitted).

The court did not err in applying USSG §3B1.1(c) to Haley's sentence.

### 2. *18 U.S.C. § 3553(a)*

Because the court correctly determined the guideline range and Haley was sentenced within that range, his sentence is entitled to a rebuttable presumption of

reasonableness. *Kristl*, 437 F.3d at 1054. Haley attempts to rebut this presumption under the § 3553(a) factors.[7] Specifically, he contends his sentence is unreasonably long considering (1) his offense was not committed with an intent to harm anyone and was non-violent, (2) his criminal history is minimal, (3) there is no indication he will commit further crimes or that he poses a danger to the public, (4) a lesser sentence would allow him to complete the 500-hour prison substance abuse treatment program and (5) Tobie received a substantially lower sentence for committing the same crime.

Haley has failed to rebut the presumption of reasonableness. In sentencing Haley towards the bottom of the guideline range, the district court considered Haley's minimal criminal history and the possibility he may die in prison. However, the court also noted the evidence against Haley was overwhelming and "[he] is a major drug dealer." (R. Vol. XVII at 36.) We agree. Haley's offenses involved 654.49 grams of crack cocaine and 334.6 grams of cocaine. While Haley may not have intended to harm anyone and no violence occurred, the sale of drugs "is a serious offense that detrimentally impacts other people's lives . . .

---

[7] These factors include: the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence, protect the public, and provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner; pertinent guidelines; pertinent policy statements; the need to avoid unwanted sentence disparities; and the need to provide restitution. 18 U.S.C. § 3553(a).

." *United States v. Pruitt*, 2007 WL 2430125, \*12 (10th Cir. 2007). Moreover, although Haley's criminal history is minimal and his past offenses occurred over ten years ago, it is apparent these past convictions and their corresponding punishments did not deter him from committing the current offense.

That Tobie received a substantially lower sentence also fails to rebut the presumption. Section 3553(a)(6) aims to prevent sentencing disparities "among defendants with similar records who have been found guilty of similar conduct." It is unclear whether Haley and Tobie have similar records. Nevertheless, Haley was found guilty of three drug offenses, whereas Tobie pled guilty to one. Therefore, they have not "been found guilty of similar conduct." Additionally, Tobie cooperated with the government. *See United States v. Davis*, 437 F.3d 989, 997 (10th Cir.) ("While similar offenders engaged in similar conduct should be sentenced equivalently, disparate sentences are allowed where the disparity is explicable by the facts on the record.") (quotations omitted), *cert. denied*, 547 U.S. 1122 (2006).

Lastly, although one of the § 3553(a) factors requires the court to consider the need for the sentence imposed to provide the defendant with needed correctional treatment, *see* § 3553(a)(2)(D), it is but one factor. Therefore, the fact a lower sentence would allow Haley to participate in the prison's substance abuse treatment program does not rebut the otherwise reasonableness of his correctly calculated guideline sentence.

**AFFIRMED**.

FOR THE COURT:

Terrence L. O'Brien
United States Circuit Judge